**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE SAFE HOUSE, LLC, | ) |
| | ) |
| | ) |
| Plaintiff, | ) **Case No.: 1:24-cv-03532** |
| | ) |
| v. | ) |
| | ) **Judge: Hon. Ana C. Reyes** |
| DISTRICT OF COLUMBIA, et al. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

COMES NOW, Plaintiff, The Safe House, LLC, by and through undersigned counsel and files this Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction.

**INTRODUCTION**

The document is a motion filed by Plaintiff, The Safe House, LLC, seeking a temporary restraining order and preliminary injunction against Defendant District of Columbia and other the named Defendants in this matter. The plaintiff argues that legislation enactment and enforcement of that legislation actions by Defendants violate several provisions of the United States Constitution and District of Columbia law.

This Memorandum of Points and Authorities provides background on the legalization of the possession and transfer of small amounts of cannabis in the District of Columbia through a voter-approved initiative (I-71) in 2014. However, due to federal restrictions, the District of Columbia has undertaken efforts to undermine legally sanctioned cannabis activity and force

businesses into the medical cannabis market.  This has led to conflicting statutory frameworks

and arbitrary enforcement actions against businesses like Plaintiff.   Plaintiff currently faces

enforcement up to and including summary closure of its business and the termination of its lease.

## SUMMARY OF FACTS

1.      In 2014, the District of Columbia began to decriminalize and legalize aspects of

recreational cannabis.

2.      The Legalization of Possession of Minimal Amounts of Marijuana for Personal

Use Act of 2014 (commonly known as "I-71") was codified into the D.C.  Criminal Code as

D.C.  Code § 48-904.01, and subsections D.C.  Code § 48-904.01(a)(1)(A) and (B), which state:

> "Notwithstanding any provision of this chapter to the contrary, it shall be lawful, and shall not be an offense under District of Columbia law, for any person 21 years of age or older to
>
> (A) Possess, use, purchase, or transport marijuana weighing 2 ounces or less;
>
> (B) Transfer to another person 21 years of age or older, *without remuneration*, marijuana weighing one ounce or less; (emphasis added)"

3.       D.C.  Code § 48-904.01(a)(1) codified recreational adult cannabis possession

and use in the District of Columbia, which legalized the possession of up to 2 ounces, home

cultivation of up to 6 plants, and non-monetary cannabis transfers.

4.      However, Congress imposed the "Harris Rider" as a provision of a Congressional

Appropriations Act, prohibiting the District from using local funds to regulate or tax cannabis

sales, forcing recreational cannabis into a self-regulated space, which was similar to the self-

certification procedures in the medical cannabis space.

5.      The Harris Rider remains in effect to date and specifically states that the District

of Columbia is prohibited from using federal or its own funding to enact or carry out any law,

rule, or regulation to legalize or otherwise reduce penalties associated with the possession, use,

or distribution of cannabis.   This includes a prohibition on the creation of regulatory frameworks that would govern the legal transfer of cannabis for recreational purposes.

6.      Establishing regulations for the legal recreational transfer of cannabis inherently involves creating laws or rules that define how such transfers can occur legally.   This process would be considered an act of legalizing or reducing penalties associated with cannabis, which the Harris Rider prohibits.

7.      The federal mandate imposed by the Harris Rider supersedes the District of Columbia's local authority.   As long as the Harris Rider remains in effect, any attempt by the District of Columbia to regulate legal recreational cannabis transfers would be in direct violation of federal law.

8.      Despite the prohibitions of the Harris Rider, but fully considering the revenue potential of cannabis, the District of Columbia enacted the Medical Cannabis Amendment Act of 2022.  This legislation sought to strengthen the medical cannabis program by allowing patients to self-certify their need for medical cannabis, removing registration fees, permitting delivery services, and laying the groundwork for an enforcement-based system to compel businesses to participate in the medical cannabis market.   The intent was to superficially grow the medical cannabis market since the recreational cannabis market could not be regulated and taxed due to the restrictions imposed by the Harris Rider.

9.      This strategy represented a clear indirect regulation of legal recreational cannabis activity and constituted government overreach.   By leveraging the provisions of the Medical Cannabis Emergency Amendment Act of 2022, the District of Columbia implemented measures to compel businesses engaging in, facilitating, and allowing lawful recreational cannabis transfers in or on their premises to participate in the medical cannabis market.   This effectively

forced these businesses into a regulatory framework that they were not obligated to join, given that their activities were legal under D.C. Code § 48-904.01(a)(1)(B).

10.    The Medical Cannabis Emergency Amendment Act of 2022 provided a transitional period for existing businesses that were engaged in, facilitated, or allowed non-remunerative cannabis transfers in or on their premises.    However, the application process required applicants to make self-incriminating statements without a knowledgeable and voluntary waiver of their Fifth Amendment right against self-incrimination.    This requirement deterred many applicants from applying, as they were reluctant to potentially expose themselves to unwarranted legal consequences.

11.    Due to the low rate of application submissions to the medical cannabis program, the District of Columbia began enacting a series of increasingly restrictive legislations under the Medical Cannabis Clarification Emergency Amendment Act of 2023, Medical Cannabis Clarification Supplemental Emergency Amendment Act of 2023, Medical Cannabis Manufacturer Clarification Emergency Amendment Act of 2024, Medical Cannabis Program Enforcement Emergency Amendment Act of 2024, Medical Cannabis License Clarification Emergency Amendment Act of 2024,  Medical Cannabis Clarification and Program Enforcement Emergency Amendment Act of 2024, Medical Cannabis Program Enforcement Congressional Review Emergency Amendment Act of 2024, Medical Cannabis Clarification Supplemental Congressional Review Emergency Amendment Act of 2024, and Medical Cannabis Conditional License and Unlicensed Establishment Closure Clarification Emergency Amendment Act of 2024.  These measures were implemented to ramp up enforcement efforts against businesses engaging in legal recreational cannabis transfers.  The intent was to funnel more participants into the medical cannabis marketplace by compelling businesses to obtain medical licenses.  By

intensifying enforcement, the District of Columbia aimed to expand the regulated medical cannabis market, compensating for the inability to regulate and tax the recreational market due to the restrictions imposed by the Harris Rider.

12.     Since the enactment of D.C. Code § 48-904.01(a)(1)(A) and (B), which legalized the possession of up to 2 ounces of cannabis and permitted the transfer of up to 1 ounce without remuneration between adults aged 21 or older, the District of Columbia has undertaken systematic efforts to undermine these legally sanctioned cannabis activities. These efforts effectively roll back the freedoms democratically established by the residents of the District of Columbia through the passage of Initiative 71. The Defendants' actions include increased enforcement measures, the enactment and application of ambiguous regulations, and the imposition of new penalties on activities that are lawful under the Code of the District of Columbia. By penalizing businesses and individuals engaging, facilitating, and/or allowing legal cannabis transfers, the District is eroding the legal rights granted under District of Columbia law and undermining the intent of the voters who supported cannabis legalization.

13.     One specific way that the District of Columbia penalizes these businesses is by enforcing D.C. Code § 7-1671.01(22). The Alcoholic Beverage and Cannabis Administration (ABCA), the Attorney General, the Department of Licensing and Consumer Protection (DLCP), the Metropolitan Police Department (MPD), the Office of the Mayor, and the Council have weaponized the definition of the term "unlicensed establishment" to impose new penalties and restrictions on legal cannabis transfers. They label these transfers as "commercial transactions," a term that is undefined and lacks a standard.

14.     This lack of definition allows for arbitrary enforcement under the statutes of Title 7, Chapter 16B of the Code of the District of Columbia, subjecting non-medical cannabis activity

to the purview of medical cannabis enforcement.  By doing so, the District of Columbia effectively increases penalties on activities that are otherwise legal under D.C.  Code § 48-904.01(a)(1)(B).  This approach also contradicts the Harris Rider's restrictions, which prohibit the District of Columbia from using funds to regulate or penalize cannabis activities beyond what is federally permissible.

15.     The District of Columbia's contradictory legislation and vague language are also unconstitutional because they do not provide notice as to what conduct is proscribed or required and encourages arbitrary decisions based upon its failure to define the term "commercial transaction" and wrongfully applying the term "unlicensed establishment."

16.     The District of Columbia initiated a systematic campaign to criminalize lawful cannabis activity within its jurisdiction by leveraging legislation enacted by the Council and the Office of the Mayor, along with enforcement actions by the Alcoholic Beverage and Cannabis Administration (ABCA), the Department of Licensing and Consumer Protection (DLCP), the Metropolitan Police Department (MPD), and the Office of the Attorney General.  This concerted effort involved applying new laws and regulations to penalize businesses and individuals engaging in cannabis activities that were legal under D.C.  Code § 48-904.01.

17.     Plaintiff operated a business at 335 H Street, N.E., Unit 1, which sold art and apparel.  On its premises, transfers of cannabis occurred pursuant to D.C.  Code § 48-904.01(a)(1)(B).  This statute permits the transfer of up to one ounce of cannabis without remuneration between adults aged 21 or older.  Therefore, Plaintiff's business activities were associated with lawful cannabis transfers in accordance with District of Columbia law.

18.     Although the District of Columbia has forced the Plaintiff and similarly situated businesses into the medical cannabis market, this market remains stagnant due to numerous

growth deterrents.  These deterrents include supply chain shortages, inadequate infrastructure, the requirement of self-incriminating disclosures during the application process, unconstitutional licensing requirements and regulations, and a shortage of laboratory testing facilities.

19.    It has been reported that in September 2024, medical cannabis sales were the second lowest of any month in the last four years of tracked sales.

20.    The first cannabis testing laboratory in the District of Columbia became operational in September of 2024, nearly a decade after the District began dispensing medical cannabis to the public.  Consequently, for ten years, medical cannabis products were not subjected to laboratory testing within the District of Columbia.  This lack of testing raised serious concerns about product safety, regulatory oversight, and the potentially misleading nature of these products being labeled as "medical cannabis."

21.    The District of Columbia allowed medical cannabis cultivators and manufacturers to "self-certify" the potency, chemical composition, and contaminants of the cannabis dispensed as "medical cannabis" with no other quality control safeguards.

22.    The District of Columbia also allowed patients to self-certify that they have medical or dental conditions qualifying them for treatment by cannabis.

23.    The District of Columbia facilitated the sale of untested cannabis to the mass public in a manner that misled the public to believe that the cannabis was medical grade and lab tested.

24.    The District of Columbia was aware that it was misleading the public because 22-C D.C.M.R.  § 5609.1 provides that dispensaries and cultivation centers may dispense or distribute medical marijuana in any form deemed safe, which allows patients to eat, inhale, or

otherwise use medical marijuana for medical purposes. Medical marijuana shall be subject to testing for quality assurance and safety purposes.

25.    The District of Columbia promulgated laws under Title 7, Chapter 16B of the D.C. Code, specifically D.C. Code §§ 7-1671.06a-b, 7-1671.08, and 7-1671.12a, which target recreational cannabis activities. However, these new laws did not establish a distinction between legal and illegal recreational adult cannabis activity. Consequently, they wrongfully and indiscriminately outlawed all recreational adult-use cannabis activity, in direct contradiction to D.C. Code § 48-904.01(a)(1)(A) and (B) and the Harris Rider. The lack of differentiation in the new laws effectively criminalized activities that were previously lawful under District of Columbia law, in a vague manner that lacked a clear standard.

26.    The District of Columbia then enacted D.C. Code § 48-1201, which states that the possession or transfer without remuneration of marijuana weighing one ounce or less shall constitute a civil violation, but such a violation shall not constitute a criminal offense or a delinquent act. This provision contradicts the language of D.C. Code § 48-904.01(a)(1)(A) and (B), which legalized the possession and transfer of up to one ounce of cannabis without remuneration. By reclassifying these previously legal activities as civil violations, the District of Columbia has effectively imposed new penalties on actions that were decriminalized, creating a legal inconsistency and undermining the rights established under the earlier statute.

27.    ABCA devised various open application periods to accept submissions for Retail, Cultivation, Manufacturing, and Courier Medical Cannabis licenses; after the conclusion of all of the medical cannabis licensing rounds, the District of Columbia increased enforcement by issuing cease-and-desist orders and summarily closing businesses without pre-deprivation

hearings, even though these cease-and-desist orders and summary closures deprive business owners and landlords of significant property and liberty interests.

28.    On March 15, 2024, ABCA Supervisory Investigator (SI) Peru inspected the premises of 335 H Street, N.E., which at the time was occupied by Plaintiff.

29.    After the inspection, SI Peru claimed in a closed ABC Board meeting that the Plaintiff was observed selling cannabis-infused edibles and drinks.  The Plaintiff disputes this accusation but was not given an opportunity to contest SI Peru's statements when they were presented at a fact-finding hearing, which the ABC Board improperly closed to both the public and the Plaintiff.

30.    Based upon the sole testimony of SI Peru, the ABC Board issued a warning letter to the Plaintiff on March 15, 2024.

31.    On July 1, 2024, Plaintiff applied for and was approved for both a conditional internet retailer and retailer medical cannabis license.

32.    On July 3, 2024, The Safe House received a Cease-and-Desist Order from the ABC Board alleging that the Plaintiff engaged in a violation of Chapter 16B of Title 7 of the Code of the District of Columbia or permitted illegal activity to occur and claimed no record of Plaintiff's applications that were submitted to ABCA.

33.    The cease-and-desist contained inaccurate facts and conclusions of law.

34.    On July 17, 2024, the Alcoholic Beverage and Cannabis Board vacated their Cease and Desist, noting and acknowledging that the Plaintiff did, in fact, submit two (2) medical applications that were approved but issued another cease-and-desist based purely on speculation.

35.    On July 30, 2024, a hearing challenging the second cease-and-desist was held before the ABC Board.

36.    The hearings that are conducted by ABCA in relation to the cease-and-desist and summary closure enforcement violate the Seventh Amendment because the respondents, such as the Plaintiff in this matter, was subject to monetary fines and property deprivation but was not granted its 7th Amendment right to a jury trial.

37.    On August 8, 2024, ABCA issued an Order Affirming the Cease and Desist.

38.    On August 16, 2024, Plaintiff received a Notice of Infraction from the DC Department of Licensing and Consumer Protection (DLCP), notice number 24ENF-CPU-00605, that on June 27, 2024, Plaintiff was charged with violating D.C. Code § 47-2851.02, Operating a business (Medical Cannabis Retail) with a license or endorsement with an attached fine of $2,436.00, and was also charged with violating 11-A DCMR § 302.1 for a failure to obtain a certificate of occupancy or use beyond the scope of the certificate of occupancy with an attached fine of $2,436.00. Furthermore, the Plaintiff was also charged with violating D.C. Code § 47-2855.02 for failing to register a trade name with the Department of Licensing and Consumer Protection with an attached fine of $609.00. Plaintiff denied these charges and requested to appear for a hearing that has not been scheduled yet.

39.    On October 30, 2024, Plaintiff received a Notice of Summary Closure. The Notice of Summary Closure is factually incorrect because Plaintiff is improperly named as the tenant/respondent at 335 H Street N.E.

40.    The events that led to the summary closure occurred on October 21, 2024, after Plaintiff had vacated the premises in August of 2024.

41.    At the time of the events that led to the summary closure, CBT, LLC, a business distinct from and not associated with Plaintiff, occupied the premises at 335 H Street, N.E.

42.    Accordingly, the events that transpired on October 21, 2024, have been erroneously attributed to Plaintiff.

43.    The Office of the Attorney General and ABCA dismissed the summary closure action against Plaintiff.

44.    The District of Columbia's statutes and regulations fail to establish a defined cessation protocol for summary closures.  Moreover, once an alleged imminent danger has been addressed and terminated, there is no statutory provision mandating an automatic termination of the summary closure within a specified timeframe, such as 30 or 60 days.  As a result, summary closure orders remain in effect indefinitely, thereby constituting an unconstitutional deprivation of property rights and takings without compensation.

## LEGAL STANDARD

A four-factor test governs whether a preliminary injunction should be issued: (1) whether there is a substantial likelihood that the movants will prevail on the merits; (2) whether they are in danger of suffering irreparable harm during the pendency of the action if the injunction is not granted; (3) whether the balance of the equities is in their favor; and (4) whether the public interest would be disserved by the issuance of an injunction.  *See District of Columbia v.  Reid*, 104 A.3d 859, 865 (D.C.  2014).

While "'economic loss does not, in and of itself, constitute irreparable harm,'" such harm will be found if economic "'loss threatens the very existence of the movant's business.'" *District of Columbia v.  Grp.  Ins.  Admin*., 633 A.2d 2, 23 (D.C.  1993) (other citations omitted).

In *District of Columbia v. E. Trans-Waste of Md., Inc.*, the court found that "especially considering the District's position that ETW lacks a valid certificate of occupancy, enforcement carries a real threat that ETW would be put out of business or, at minimum, subjected to significant expense in seeking a permit for its operations." *District of Columbia v. E. Trans-Waste of Md., Inc.*, 758 A.2d 1, 15 (D.C. 2000).

## ARGUMENT

## I.  Plaintiff Demonstrates A Substantial Likelihood That It Will Prevail On The Merits.

The Plaintiff presents a compelling case for success on the merits, supported by constitutional, statutory, and factual evidence. The Plaintiff argues that the enforcement actions by the Alcoholic Beverage and Cannabis Administration (ABCA) and other Defendants violate its Seventh Amendment right to a jury trial in common-law actions. Specifically, the Plaintiff contends that imposing monetary penalties and property deprivations without the opportunity for a jury trial is unconstitutional. The Plaintiff further argues that Defendants enforcement actions and adjudication procedures infringe on its Fifth Amendment right to procedural due process and prohibition against government takings without compensation. Additionally, although Plaintiff has significant property interest at stake Defendants do not allow for pre-deprivation hearings and the post-deprivation hearings are insufficient considering Plaintiff's property interest. Defendant ABCA's adjudication procedures led to erroneous determinations and significant harm to the Plaintiff. Plaintiff contends that Defendant ABCA's administrative proceedings lack impartiality because the ABC Board's chairman acts as both prosecutor and decision-maker.

The Plaintiff also raises facial and as-applied constitutional challenges to various statutes, including D.C. Code §§ 7-1671.01(9), (22) and 7-1671.08, arguing that they are unconstitutionally vague. These statutes conflict with the legal protections provided under D.C.

Code § 48-904.01(a)(1)(A) and (B), creating an ambiguous legal standard and enabling arbitrary enforcement. This regulatory inconsistency undermines the Plaintiff's ability to operate within the bounds of the law. Given these robust constitutional claims and evidentiary support, the Plaintiff has established a substantial likelihood of prevailing on the merits. Granting the requested injunction serves not only to protect Plaintiff but also to (1) signal to regulators the importance of adhering to constitutional mandate, (2) encourage the adoption of clearer, more equitable statutes and procedures, and (3) foster an environment where businesses can operate without fear of arbitrary or contradictory enforcement.

Plaintiff sets forth the merit of each of its claims in detail below and contends that each claim has a substantial likelihood to succeed on those merits.

## A. SEVENTH AMENDMENT

The administrative adjudications conducted by the ABCA's ABC Board without providing a jury trial unequivocally violate the Seventh Amendment of the United States Constitution. This Amendment guarantees the right to a jury trial in suits at common law where the value in controversy exceeds twenty dollars. The right is not confined to the common-law forms of action recognized at the Amendment's ratification but extends to all legal actions that are not of equity or admiralty jurisdiction.

The Seventh Amendment applies to the District of Columbia and its agencies, including ABCA, through the District of Columbia Home Rule Act. This Act grants the District of Columbia the authority to enact and enforce laws but does not exempt it from constitutional constraints. Therefore, the constitutional right to a jury trial, as preserved by the Seventh Amendment, is fully applicable to the District of Columbia's laws and administrative actions.

This is supported by D.C. Superior Court Civil Rule 38. This rule preserves the right to a jury trial as declared by the Seventh Amendment or provided by applicable statutes. This rule underscores the District of Columbia's recognition of the fundamental right to a jury trial in civil proceedings. The incompatibility between this rule and ABCA's adjudication practices highlight the constitutional violation inherent in adjudicating legal disputes without offering a jury trial as is the case here. Plaintiff was adjudicated by ABCA and was subject to penalties of property deprivation and fines the valued more than twenty dollars, however, the ABCA adjudication procedures did afford Plaintiff and jury trial.

Under 42 U.S.C. § 1983, any person acting under color of state law who deprives a citizen of constitutional rights is liable to the injured party. ABCA's enforcement actions, sanctioned by specific District of Columbia statutes, have deprived the Plaintiff of the constitutional right to a jury trial. The statutes in question, D.C. Code §§ 47-2844(a-1)(1)(A) and (B); 47-2844(a)(2); 7-1675.01(b); 7-1671.08(f)(2)(A); 7-1671.08(d); 7-1671.12e(a); and 7-1671.12a(b)(1), authorize the imposition of civil penalties and declarations of nuisance without offering any mechanism for a jury trial. These penalties are punitive, focusing on culpability, deterrence, and recidivism, and are akin to traditional common-law actions at law, which historically require a jury trial.

The "public rights" exception, which allows Congress to assign certain disputes to non-Article III tribunals without a jury trial, does not apply here. The rights at issue are private rights concerning legal remedies traditionally enforced in courts of law. They are not part of a specialized regulatory scheme necessitating administrative adjudication. ABCA has stated that the use of lay witness to identify cannabis is an acceptable practice and expert testimony is not required to identify cannabis. This supports the position that ABCA does not rely on specialized

knowledge to necessitate its administrative adjudications, and a jury is well situated to make same determinations. Furthermore, the penalties imposed are not integral to a regulatory program requiring expert administrative resolution but are straightforward legal sanctions akin to those in common-law actions.

In *SEC v. Jarkesy*, the Fifth Circuit applied a two-part test from *Granfinanciera, S. A. v. Nordberg* and held that administrative proceedings imposing civil penalties for securities fraud violated the Seventh Amendment because the actions were analogous to common-law fraud claims and the "public rights" exception did not apply. Similarly, ABCA's enforcement actions involve civil penalties and nuisance declarations that are legal in nature and historically warrant a jury trial. *SEC v. Jarkesy,* 144 S. Ct. 2117, 2136 (2024). Additionally, ABCA references and alleges violations of the criminal code, specifically D.C. Code 48-904.01, in its cease-and-desist and summary closure orders. A jury would be expected to render a verdict based upon its evaluation of the same code in a criminal matter.

Moreover, D.C. Code § 7-1671.12e(a) declares unlicensed establishments selling or exchanging cannabis as nuisances—a common-law term recognized since the 12th century. By using "nuisance" deliberately, the D.C. Council incorporated common-law prohibitions, confirming that these cease-and-desist and summary closure orders are legal actions subject to the Seventh Amendment's jury trial requirement.

Finally, the "public rights" exception does not apply here because Congress did not assign adjudication of D.C. Code 48-904.01 to an ABCA tribunal without a jury. Plaintiff argues further that Congress through the "Harris Rider" prohibits ABCA from adjudicating D.C. Code 48-904.01. Thus, the "public rights" exception does not apply and Plaintiff should have

been afforded a jury trial to dispute ABCA's allegations that it violated D.C. Code 48-904.01 and was an "unlicensed establishment."

ABCA's practice of not affording respondents like Plaintiff a Seventh Amendment guaranteed right to a jury trial harmed Plaintiff because ABCA's adjudication process and procedures lack oversight, check and balances, and impartiality. The Board conducts improperly closed-door fact-finding hearings and issues cease-and-desist and summary closures orders without allowing respondents to challenge evidence or participate in hearings, as outlined in D.C. Municipal Regulation 22-C6280.1. These practices have denied Plaintiff of due process and its right to a jury trial and has caused ABCA to issue cease-and-desist and summary closure orders against Plaintiff that were prejudicially erroneous and defamatory.

Injunctive relief is the only remedy to ABCA's failure to provide Plaintiff with a jury trial because the relevant statutes and procedures fail to provide any avenue for the Plaintiff to exercise the right to a jury trial, rendering them unconstitutional on their face. They do not offer any circumstances under which a litigant can exercise this fundamental right, thus failing the test for facial constitutionality. Alternatively, they are unconstitutional as applied to the Plaintiff because they target businesses engaging in lawful activities, such as the transfer of marijuana without remuneration between adults over 21 years of age, and impose penalties without granting a jury trial.

The enforcement of statutes and procedures that do not afford Plaintiff and jury trial directly conflict with D.C. Superior Court Civil Rule 38, which preserves the right to a jury trial. By circumventing this rule through administrative adjudication without jury trials, ABCA and other Defendants violate both local procedural rules and constitutional mandates. By enforcing statutes and practices that deprive the Plaintiff of the Seventh Amendment right to a jury trial,

Defendants, acting under color of law, are liable under 42 U.S.C. § 1983. The Plaintiff has suffered financial losses, cessation of business operations, and reputational harm as a direct result of these unconstitutional actions.

In conclusion, the ABCA's administrative adjudications without a jury trial are unconstitutional. The Seventh Amendment applies to the District of Columbia and its agencies through the D.C. Home Rule Act. The rights at issue are legal in nature and are not part of a specialized regulatory scheme necessitating administrative adjudication. The "public rights" exception does not apply. The statutes in question are incompatible with the constitutional guarantee of a jury trial and conflict with D.C. Superior Court Civil Rule 38.

Therefore, Plaintiff demonstrates a substantial likelihood to succeed on its Seventh Amendment claim.

## B. FIFTH AMENDMENT – DUE PROCESS

Plaintiff was deprived of procedural due process under the Fifth Amendment due to the lack of impartial and meaningful hearings conducted by the ABC Board. The Fifth Amendment prohibits the government from depriving any person of "life, liberty, or property, without due process of law." This constitutional guarantee requires that adjudicative proceedings be conducted by an impartial and disinterested tribunal, ensuring that parties receive a fair and neutral hearing. The requirement extends beyond mere impartiality; the adjudicator must also appear to be impartial to a reasonably prudent, disinterested observer. In assessing whether the procedural safeguards provided meet constitutional requirements, the Supreme Court's three-factor test established in *Mathews v. Eldridge*, is instructive. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The factors to consider are:

First, the private interest affected by the official action is substantial. The Plaintiff's ability to operate its business; sustain its livelihood; and protection against vague economic regulations; are at stake. The deprivation of one's means of earning a living is a severe infringement on personal rights, as recognized in cases like *Federal Deposit Ins. Corp. v. Mallen* and *Cleveland Bd. of Educ. v. Loudermill*. *Federal Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 241-248 (1988); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 537 (1985). Plaintiff has a significant interest in operating free from unlawful government intervention.

Second, the risk of erroneous deprivation through the procedures used is high, and the probable value of additional or substitute procedural safeguards is considerable. The procedures employed by the ABCA are fundamentally flawed. The Board's chairman acts in a dual capacity as both prosecutor and decision-maker during fact-finding, cease-and-desist, and summary closure hearings. He calls witnesses for the government, cross-examines the accused's witnesses, examines evidence, objects to counsel's questioning, and ultimately recommends the Board's decision. It is noteworthy that a recommendation of the Board has never been rejected. This conflation of roles violates the requirement for an impartial adjudicator and undermines the fairness of the proceedings.

Furthermore, the ABC Board conducts closed-door fact-finding hearings prior to issuing cease-and-desist orders or summary closures, relying solely on *ex parte* communications and the testimony of a single investigator. These hearings exclude the Plaintiff, denying any opportunity to challenge evidence or present a defense before the deprivation occurs. Such procedures are inconsistent with due process requirements, as they fail to provide notice and a meaningful opportunity to be heard at a time when the deprivation can still be prevented, as mandated by *Fuentes v. Shevin*. *Fuentes v. Shevin*, 407 U.S. 67, 82-82 (1972).

The risk of erroneous deprivation is evidenced by the ABCA's own actions: (1) issuing a cease-and-desist order based on the incorrect assertion that the Plaintiff did not have a pending application, when in fact it did; and (2) erroneously issuing a summary closure against Plaintiff after Plaintiff vacated the premises. These errors highlight the inadequacy of the procedures and the necessity for additional safeguards. The improper placement of the burden of proof on the Plaintiff, whose liberty interests are at risk, further exacerbates the risk of error. An agency cannot shift the burden of proof to the respondent in the only hearing where they are permitted to appear, as this practice violates due process.

Third, the government's interest does not outweigh the need for proper procedural safeguards. While the District of Columbia has a legitimate interest in protecting public health and safety, this interest does not justify the denial of constitutional due process. The enforcement actions taken against the Plaintiff contradict the District's own laws, such as D.C. Code § 48-904.01(a)(1)(B), which permits certain cannabis-related activities. Moreover, the government cannot justify unconstitutional procedures by citing administrative convenience or fiscal burdens. The government's interest does not supersede the Plaintiff's right to a fair hearing before an impartial tribunal.

The statutes governing these proceedings, specifically D.C. Code §§ 7-1671.12a(a), 7-1671.12a(b)(1), 7-1671.08(g)(3)-(5), and 7-1671.08(h)(1), fail to provide the necessary procedural safeguards. They permit the issuance of cease-and-desist orders and summary closures based solely on *ex parte* communications without prior notice or hearing. The opportunity for a post-deprivation hearing is inadequate, especially when it places the burden of proof on the Plaintiff. The ABCA's practices also contravene D.C. Municipal Regulation 22-C6208.5 and D.C. Code § 2-575, which mandate that fact-finding hearings be open to the

public.  By conducting closed hearings and issuing final orders based on undisclosed evidence, the Board denies the Plaintiff a meaningful opportunity to contest the findings.

Given these substantial procedural deficiencies, the statutes and practices in question are unconstitutional on their face because they violate the Plaintiff's due process rights under the Fifth Amendment.  They provide no circumstances under which a respondent can secure an impartial and disinterested tribunal or where the District of Columbia satisfies due process requirements.  As such, they fail the test for facial constitutionality.  Alternatively, these statutes and practices are unconstitutional as applied to the Plaintiff.  ABCA's application of these laws denies the Plaintiff the opportunity for a fair hearing before an impartial adjudicator and fails to provide procedural safeguards commensurate with the severity of the deprivation—namely, the loss of the Plaintiff's business operations and livelihood.

Under 42 U.S.C.  § 1983, Defendants, acting under color of law, are liable for depriving the Plaintiff of rights secured by the Constitution.  The actions of Defendants Muriel Bowser, Brian Schwalb, Fred Moosally, Tiffany Crowe, and Pamela Smith have resulted in significant harm to the Plaintiff, including financial losses, cessation of operations, and reputational damage.

The Supreme Court of the State of New York, *In the Matter of the Application of AS A 456 Corp.v.  City of New York* recently found that similar government action, after which the District of Columbia enforcement laws are modeled, to be an unconstitutional violation of the due process requirements set for in *Mathews v.  Eldridge* and *Fuentes v.  Shevin.*  (*See Mathews v.  Eldridge*, 424 U.S. 319, 333 (1976); *Fuentes v. Shevin*, 407 U.S.  67, 82-83 (1972)).

The Plaintiff demonstrates a substantial likelihood to succeed on the merits of its due process Fifth Amendment claim.

**C.  87 STAT.  774 – D.C.  Home Rule Act**

To demonstrate a violation of the District of Columbia Home Rule Act, one must show that the D.C. Council has exceeded its legislative authority as defined by the Act. Specifically, the Council's legislation must either directly contravene the specific prohibitions outlined in the Act or indirectly undermine its statutory framework and intent. This principle is supported by cases such as *Woodroof v.* Cunningham and *Price v. D.C. Bd. of Ethics & Gov't Accountability.* (*See In re Prosecution of Perrow*. *Woodroof v. Cunningham*, 147 A.3d 777, 791 (D.C. 2016); *Price v. Bd. of Ethics & Gov't Accountability,* 284 A.3d 1019, 1023-1024 (D.C. 2022); and *In re Perrow,* 172 A.3d 894, 902 (D.C. 2017)).

The District of Columbia's medical cannabis laws encroach upon the executive functions of the District and conflict with federal appropriations acts that bar the further regulation of adult-use cannabis. Additionally, these contradictions violate the D.C. Home Rule Act, which delineates and separates legislative and executive powers. Statutes such as D.C. Code § 7-1671.08 unlawfully merge these powers and infringe upon the doctrine of separation of powers that is fundamental to the Home Rule Act.

Under the D.C. Home Rule Act, the legislative power is vested in and exercised by the D.C. Council (D.C. Code § 1-204.04(a)), while the executive power is vested in the Mayor, who serves as the chief executive officer of the District of Columbia government. The Act establishes a clear system of government that vests executive, legislative, and judicial functions in separate entities to maintain the sanctity of that division of responsibility. Non-legislative matters cannot be properly submitted for legislative initiative without violating this separation, just as executive matters should not encroach upon the Council's legislative powers.

However, D.C. Code §§ 25-206(d) and 25-207(a) blur this separation. Section 25-206(d) stipulates that the Mayor can only remove an ABC Board member for "just and

reasonable cause," while Section 25-207(a) states that the Director of ABCA can only be removed by the ABC Board for "just and reasonable cause." This dual for-cause limitation on the removal of executive officers contravenes the doctrine of separation of powers by intertwining the legislative and executive branches in personnel decisions, thereby exceeding the Council's legislative authority under the Home Rule Act.

Moreover, D.C. Code § 25-204.02 assigns the ABC Board and ABCA responsibilities that include carrying out duties under Chapter 16B of Title 7 and any responsibilities of the mayor under the medical cannabis Acts. This statute effectively merges legislative and executive functions, further violating the separation of powers mandated by the Home Rule Act. The ABC Board, a legislative entity, performs executive functions without proper authority, infringing upon the mayor's executive role.

Additionally, Title 7, Chapter 16B, and the medical cannabis Acts, particularly in defining an "unlicensed establishment," contradict federal appropriations acts that prohibit the use of District funds to regulate legal cannabis activity. By enacting and enforcing statutes that conflict with federal law, the D.C. Council exceeds its legislative authority as circumscribed by the Home Rule Act, which requires adherence to federal statutes and appropriations. ABCA's practices exacerbate these violations. ABCA requires self-incriminating affidavits, and the ABC Board conducts closed-door hearings, exceeding its statutory authority and violating procedural safeguards. These actions not only overreach the Board's legal mandate but also undermine public accountability principles enshrined in D.C. Code § 2-575, which mandates transparency in government proceedings. The lack of public transparency in ABCA adjudications erodes public confidence in fair governance, especially when lawful businesses are subjected to arbitrary enforcement actions.

In light of these considerations, the statutes described in D.C. Code §§ 25-206(d); 25-207(a); 25-204.02; and provisions within Title 7, Chapter 16B, are unlawful on their face because they violate the D.C. Home Rule Act and its separation of powers doctrine in all applications. They fail to provide any circumstances under which they could be applied without infringing upon the separation of powers mandated by the Act. Alternatively, these statutes are invalid as applied to the Plaintiff. The enactment, administration, and enforcement of these statutes encroach upon legal cannabis activities despite federal prohibitions on fund expenditures for such regulation. By targeting Plaintiff, a lawful business engaged in activities permitted under District law, Defendants are applying statutes that violate the Home Rule Act's separation of powers, thereby causing direct harm to the Plaintiff. Under 42 U.S.C. § 1983, the Defendants are liable for these deprivations of rights secured by federal law.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its Home Rule Act claim.

## D. ARTICLE I, S.8, C.3

The Commerce Clause of the United States Constitution, found in Article I, Section 8, Clause 3, grants Congress the power to regulate commerce among the states. This clause has been interpreted to include a "negative" or "dormant" aspect, which prohibits states and the District of Columbia from enacting laws that unjustifiably discriminate against or burden interstate commerce. As the District of Columbia Court of Appeals noted in *District of Columbia v. E. Trans-Waste of Md., Inc.*, the Dormant Commerce Clause denies the states the power to hinder the free flow of commerce among them. *District of Columbia v. E. Trans-Waste of Md., Inc.*, 758 A.2d 1, 16 (D.C. 2000), quoting the Supreme Court's decision in *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 98 (1994).

When analyzing the constitutionality of statutes under the Dormant Commerce Clause, the Supreme Court has established two primary approaches.  The first asks whether the statute discriminates against interstate commerce, either on its face or in effect.  Cases such as *C & A Carbone, Inc.  v.  Town of Clarkstown*, *Philadelphia v.  New Jersey*, and *Chemical Waste Management, Inc.  v.  Hunt*, illustrate that statutes overtly discriminating against interstate commerce are subject to strict scrutiny and are virtually per se invalid.  *C & A Carbone, Inc.  v.  Town of Clarkstown*, 511 U.S.  383, 390 (1994), *Philadelphia v.  New Jersey*, 437 U.S.  617, 624 (1978), and *Chemical Waste Management, Inc.  v.  Hunt*, 504 U.S.  334, 342 (1992).  As the Eighth Circuit explained in *U & I Sanitation v.  City of Columbus*, such laws will be struck down unless the state or locality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest.  *U & I Sanitation v.  City of Columbus*, 205 F.3d 1063, 1067 (8th Cir.  2000).

The second approach considers whether the statute imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits," as established in *Pike v.  Bruce Church, Inc.  Pike v.  Bruce Church, Inc.*, 397 U.S.  137, 142 (1970); *C & A Carbone*, 511 U.S.  at 390.

In the present case, the Plaintiff challenges the District of Columbia's preferential licensing scheme for residents and the exclusion of out-of-state entities as unconstitutional burdens on interstate commerce under the Dormant Commerce Clause.  This discrimination lacks a legitimate local purpose and imposes undue burdens on non-resident businesses.  Under 42 U.S.C.  § 1983, any person acting under color of state law who deprives another of constitutional rights is liable to the injured party.  The Dormant Commerce Clause prohibits

states, including the District of Columbia, from enacting laws that discriminate against citizens

of other states.

On March 22, 2023, the District of Columbia enacted the Medical Cannabis Amendment

Act of 2022. The D.C. Council stated that its goal was to create a regulated cannabis market and

prioritize racial and economic equity, noting that Black residents comprised roughly 90% of all

cannabis arrests since 2001 despite similar usage rates among white residents. However, D.C.

Code § 7-1671.01(a)(20B) extends social equity benefits to all residents with previous "cannabis

or drug-related offenses," including convictions for more dangerous controlled substances like

cocaine or opioids. This broad inclusion undermines the Act's stated purpose of rectifying

disparities specifically related to cannabis enforcement. The District of Columbia cannot offer a

rational basis for including individuals with non-cannabis drug offenses when the intent is to

benefit those harmed by past cannabis laws. By maintaining and enforcing laws not rationally

related to advancing the interests of those targeted by the war on drugs, the Defendants violate

the Plaintiff's individual rights under the Fifth Amendment and 42 U.S.C. § 1983.

The Act provides preferences to District residents over out-of-state applicants for

cannabis licenses. Social Equity Applicants must be businesses incorporated in the District, and

individual applicants must be D.C. residents pursuant to D.C. Code § 7-1671.01(20C).

Additionally, dispensaries are prohibited from purchasing medical marijuana from sources

outside the District of Columbia 22-C D.C.M.R. § 5700. Social Equity Applicants also receive

advantages such as reduced application and renewal fees.

These statutes discriminate against interstate commerce by favoring in-state businesses

and residents over out-of-state entities. Such state statutes that discriminate against interstate

commerce face a virtually per se rule of invalidity. The District of Columbia cannot demonstrate

that these statutes serve a legitimate local purpose that cannot be adequately served by nondiscriminatory means.

Under the first Dormant Commerce Clause approach, the statutes overtly discriminate against interstate commerce. They are protectionist measures favoring in-state interests, which is unconstitutional unless the state can prove it has no other means to advance a legitimate local interest. The District of Columbia has not met this rigorous standard.

Under the second Dormant Commerce Clause approach, even in the absence of overt discrimination, the statutes impose burdens on interstate commerce that are unequivocally excessive relative to the purported local benefits. Washington, D.C.'s approved cannabis cultivation capacity is limited to less than 20,000 square feet of canopied growth, a volume grossly insufficient to supply the six to eight licensed medical dispensaries currently operating within the District of Columbia. Moreover, this capacity is vastly inadequate to meet the demands of approximately sixty new retail licensees who have been coerced into the medical cannabis market due to the Defendants' stringent enforcement practices. Complicating this issue further, the District of Columbia prohibits the importation of medical cannabis, effectively eliminating any possibility of sourcing additional supply from outside the jurisdiction to address local shortages. Consequently, the medical cannabis market within the District of Columbia cannot rely on out-of-state suppliers to sustain its operations and accommodate the newly mandated licensees. This imposes significant burdens on interstate commerce and inflicts self-inflicted damage upon the District of Columbia's own medical cannabis market by undermining its ability to support and regulate local businesses effectively. Thus, the statutes in question place unreasonable and disproportionate demands on interstate commerce without delivering commensurate local benefits, thereby violating the Dormant Commerce Clause.

The statutes and practices provide no circumstances under which the Plaintiff can exercise the right to be free from the District of Columbia's discriminatory protectionist measures.  Therefore, the statutes fail the test for facial constitutionality.  Alternatively, they are unconstitutional as applied to the Plaintiff because they promote protectionist measures that disadvantage out-of-state businesses, violating the Dormant Commerce Clause.

Under 42 U.S.C.  § 1983, Defendants, acting under color of law, are liable for violating the Dormant Commerce Clause.  Plaintiff has demonstrated a substantial likelihood to succeed on the merits of its Dormant Commerce Clause claim.

### E.  FIFTH AMENDMENT – Due Process Void for Vagueness

The void-for-vagueness doctrine unequivocally applies to the District of Columbia's agency enforcement actions and its medical cannabis statutes.  This constitutional principle mandates that laws must be drafted with sufficient clarity to inform individuals of the conduct that is prohibited, thereby preventing arbitrary and discriminatory enforcement.  The doctrine ensures that statutes provide clear standards to law enforcement and the public, safeguarding against the delegation of basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis.

In *Woods v.  District of Columbia Nurses' Examining Board,* the court held that unduly vague regulations are constitutionally inadequate because they deprive individuals of notice regarding what conduct is proscribed or required, encouraging arbitrary decisions.  *Woods v. District of Columbia Nurses' Examining Board,* 436 A.2d 369, 374 (D.C. 1981).  Similarly, in *District of Columbia v.  Walters*, the court found that a statute was void for vagueness because it subjected defendants to criminal liability under an indefinite standard, leading to arbitrary enforcement.  *District of Columbia v. Walters*, 319 A.2d 332, 336-337 (D.C. 1974).  The test for

unconstitutional vagueness is whether the language of the regulation is so vague concerning what conduct is either prohibited or required that persons of common intelligence must guess at its meaning. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162-63 (1972).

Applying this doctrine to the District of Columbia's medical cannabis statutes reveals significant constitutional deficiencies. D.C. Code § 48-904.01(a)(1)(B) legalizes the transfer of marijuana weighing one ounce or less, without remuneration, between persons aged 21 or older. The statute does not distinguish between commercial and non-commercial activity, nor does it prohibit such transfers from occurring on commercial premises. In contrast, D.C. Code §§ 7-1671.01(9) and (22) define "distribute" and "unlicensed establishment" in a manner that fails to exempt the lawful conduct permitted under § 48-904.01(a)(1)(B). Specifically, the term "commercial transaction" is undefined, and the phrase "exchange as part of a commercial transaction" does not clearly apply to or exclude the legal "transfer without remuneration" authorized by law.

This conflicting statutory framework creates an environment where lawful businesses cannot discern compliance requirements, subjecting them to penalties for conduct that is ostensibly legal. The regulatory ambiguity enables arbitrary enforcement practices, exacerbating harm to businesses like the Plaintiff's. The use of vague statutes in enforcement actions, such as cease-and-desist and summary closure orders, impermissibly delegates to enforcement agencies such as ABCA, DLCP, and MPD the authority to determine what constitutes illegal activity on an ad hoc basis. This delegation leads to arbitrary and discriminatory application, violating the void-for-vagueness doctrine as articulated in *Woods* and *Walters*.

Moreover, the contradictions between D.C. Code § 48-904.01(a)(1)(B) and enforcement under the numerous medical cannabis Acts amplify the confusion. The Acts' provisions, such

as D.C. Code § 7-1671.12a, allow the ABC Board to issue cease-and-desist orders based on vague definitions that conflict with established lawful conduct. The Plaintiff is subjected to enforcement actions without clear guidance on what behavior is prohibited, infringing upon their substantive due process rights to engage in lawful business activities free from arbitrary government interference.

The statutes also fail to provide adequate notice of prohibited conduct concerning cannabis testing requirements. While 22-C DCMR § 5609.1 mandates that medical marijuana be subject to testing for quality assurance, the ABCA has historically allowed medical cannabis cultivators and dispensaries to circumvent these testing regulations through self-certification processes. Despite this, medical cannabis acts require recreational cannabis to be lab tested, while it allowed self-certification of quality and potency from medical cultivators in the District of Columbia that sold those products to dispensaries that sold the self-certified products to the public for a decade under the title of medical cannabis. This inconsistent enforcement further illustrates the arbitrary application of vague statutes, as the ABC Board routinely cites the lack of testing as an irreparable harm in enforcement actions against businesses like Plaintiff.

Additionally, the statutory definitions of "marijuana" and "cannabis" are contradictory and vague. D.C. Code § 48-901.02(3)(A) excludes certain cannabis derivatives from the definition of "marijuana," while the Medical Cannabis Act regulates substances beyond this scope under the term "cannabis." This discrepancy creates further uncertainty for businesses attempting to navigate compliance.

The cumulative effect of these vague and conflicting statutes is a violation of the Plaintiff's constitutional rights under the Fifth Amendment. The statutes are unconstitutional on their face because they do not provide any circumstances under which a person of common

intelligence can understand what conduct is prohibited, thereby failing the test for facial constitutionality.  Alternatively, they are unconstitutional as applied to the Plaintiff due to discriminatory enforcement practices targeting lawful business activities, resulting in financial losses, cessation of business, and reputational harm.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its Fifth Amendment void for vagueness claim.

### F.  FIFTH AMENDMENT-TAKINGS

In cases of regulatory takings, courts apply a multi-factor inquiry as established in *Penn Central Transportation Co.  v.  New York City*.  *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124 (1978).  This analysis considers factors such as the character of the governmental action, the economic impact on the property owner, and the owner's reasonable investment-backed expectations (see *Embassy v. Mayor's Agent,* 944 A.2d 1036, 1052 (D.C. 2008); *Gordon v. Dist. of Columbia,* 309 A.3d 543, 562-563 (D.C. 2024)).  For a successful claim, the property owner must show that the government action has caused a loss of all economically viable use of the property and that the regulation or action directly resulted in this loss.

Here, the character of the governmental action is unconstitutional and punitive.  The economic impact on the property owner is severe, and the owner's reasonable investment-backed expectations have been extinguished.

Under 42 U.S.C.  § 1983, any person who, under color of any statute, ordinance, regulation, custom, or usage of any State, Territory, or the District of Columbia, subjects or causes to be subjected any citizen of the United States or other person within its jurisdiction to the deprivation of rights secured by the Constitution and laws, shall be liable to the injured party

in an action at law or equity. By maintaining and enforcing laws that deprive the Plaintiff of its property rights and causing the loss of economic viability of both the premises and the business itself, the Defendants are enforcing statutes and regulations that amount to a governmental taking without compensation. This violates the Plaintiff's Fifth Amendment rights, entitling the Plaintiff to permanent injunctive relief against such statutes and regulations.

D.C. Code § 7-1671.08(g)(1) provides that ABCA has the authority to inspect an unlicensed establishment and, if it presents an imminent danger to public health or safety, may summarily close and padlock the establishment without a prior hearing, seizing all cannabis and cannabis products found on the premises. The Plaintiff received a summary closure even after complying with a cease-and-desist order that led to ceasing operations and relocating. Consequently, the Plaintiff has lost the economically viable use of its retail store at 335 H Street, N.E.

In issuing summary closures under D.C. Code § 7-1671.08(g)(1), the ABC Board applies D.C. Code § 7-1671.01(22) to establish authority to inspect and summarily close businesses without a prior hearing, allowing for the seizure of cannabis rightfully possessed under D.C. Code § 48-904.01(a)(1)(A). The Plaintiff contends that its right to protect its property from unlawful government actions or those lacking legitimate purpose is substantial enough to warrant a pre-deprivation hearing. The post-deprivation hearing provided is constitutionally insufficient, especially since the enforcement action results in the summary closure and padlocking of the business, effectively nullifying its goodwill and value without compensation.

The statutes, D.C. Code §§ 7-1671.01(9) and (22); § 7-1671.08(g)(1), and the practices of ABCA, MPD, DLCP, and the District of Columbia are unconstitutional on their face because they violate the Fifth Amendment right against governmental takings without compensation in

all applications.  They do not provide any circumstances under which a litigant can exercise their right to be free from regulatory governmental takings without compensation.  The regulations have directly caused a loss of all economically viable use of the property because a summary closure prevents any use while it remains in effect.

Alternatively, the statutes are constitutionally invalid as applied because they discriminate against businesses engaged in lawful activities where individuals aged 21 or older transfer up to one ounce of cannabis without remuneration, possess up to two ounces, or store cannabis allocated to persons aged 21 or older that does not exceed two ounces per person. ABCA's enforcement through cease-and-desist orders and summary closures results in the loss of all economically viable use of property, amounting to a governmental taking without compensation.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its Fifth Amendment takings claim.

### G.  CONTRACTS CLAUSE

To demonstrate a violation of the Contracts Clause due to legislative enforcement compelling a plaintiff to terminate a lease with a landlord in the District of Columbia, the plaintiff must establish three key elements.  First, there must be a substantial impairment of a contractual relationship.  This means that the legislation in question has significantly altered the terms or enforceability of the lease agreement (see *Dist. of Columbia Metro. Police Dep't v. Dist. of Columbia Pub. Emp. Relations Bd.,* 301 A.3d 714, 724 (D.C. 2023*)*; *West End Tenants Ass'n v. George Washington University,* 640 A.2d 718, 733 (D.C. 1994.

In this case, ABCA's enforcement of D.C.  Code §§ 7-1671.08, 7-1671.12a, and 7-1675.01 against Plaintiff has substantially impaired the contractual relationship with the property

owner of 335 H Street, N.E.  The lease agreement between the Plaintiff and the property owner
was terminated due to fears of further enforcement action under these statutes.  Both parties
mutually agreed to terminate the lease to avoid potential penalties, thereby significantly altering
the enforceability and terms of their contractual relationship.

Second, the plaintiff must demonstrate that the impairment is not justified by a significant
and legitimate public purpose.  This involves proving that the legislative action does not serve a
vital public interest substantial enough to warrant the impairment of the contract (see *Dist. of
Columbia Metro. Police Dep't v. Dist. of Columbia Pub. Emp. Relations Bd.,* 301 A.3d 714, 724
(D.C. 2023); *West End Tenants Ass'n v. George Washington University,* 640 A.2d 718, 733 (D.C.
1994).  Here, the District of Columbia lacks a significant and legitimate public purpose for
impairing the contractual relationship because the Plaintiff did not violate D.C.  Code Title 7,
Chapter 16B.  The Plaintiff has not committed any of the offenses considered an imminent
danger to public health or safety under D.C.  Code §§ 7-1671.08(g)(2) and (h)(1).  Any transfers
of cannabis on the premises were conducted in compliance with D.C.  Code § 48-
904.01(a)(1)(B), which permits such activity.  Therefore, the legislative enforcement does not
serve a substantial public interest that justifies the impairment of the contract.

Third, even if the impairment is justified by a significant public purpose, the plaintiff
must show that the impairment is not based upon reasonable conditions or is not of a character
appropriate to the public purpose justifying the legislation's adoption.  This means that the
conditions imposed by the legislation must be reasonable and appropriately tailored to achieve
the public purpose without unnecessarily infringing on contractual rights (see *Dist.  of Columbia
Metro.  Police Dep't v.  Dist.  of Columbia Pub.  Emp.  Relations Bd.,* 301 A.3d 714 (D.C.
2023); *West End Tenants Ass'n v.  George Washington University, 640 A.2d 718 (D.C.  1994)*).

In this situation, the impairment is not based upon reasonable conditions. Legal activities pursuant to D.C. Code § 48-904.01 that occurred on the Plaintiff's premises have been mischaracterized as violations of D.C. Code Title 7, Chapter 16B, solely because they took place on commercial premises, which is unreasonable. The contractual impairment is not justified by a public purpose because the Plaintiff is compliant with the relevant statutes.

Furthermore, the ABCA's issuance of a summary closure and cease-and-desist without a pre-deprivation hearing exacerbates the unreasonable nature of the impairment. The summary closures applied to both the Plaintiff and the property owner resulted in the locks to the premises being changed, denying access to both Plaintiff and the property owner. The Plaintiff had already vacated the premises and terminated the lease prior to the issuance of the Notice of Summary Closure, rendering the action erroneous. The lease between the Plaintiff and the property owner is a private contract, and the ABCA's actions constitute government interference intended to, and which did, in fact, disrupt this contractual relationship.

D.C. Code §§ 7-1671.01(9) and (22), and § 7-1671.08(g)(1), along with the District of Columbia's enforcement practices, do not provide any circumstances under which a litigant can exercise their protection under the Contracts Clause to be free from government interference with private contracts. Therefore, these statutes are unconstitutional on their face. Alternatively, they are unconstitutional as applied because they discriminate against businesses engaged in lawful activities where individuals aged 21 or older transfer up to one ounce of cannabis without remuneration, possess up to two ounces, or store cannabis not exceeding two ounces per person. The enforcement actions, including cease-and-desist orders and summary closures, interfere with private commercial lease contracts by forcing property owners to terminate leases with such businesses, violating the Contracts Clause.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its Contracts Clause claim.

### H.  D.C.  CODE §2-509 – *Ex Parte* Communications

To demonstrate a violation of D.C.  Code § 2-509 based on *ex parte* communications in the District of Columbia, a plaintiff must show that such communications compromised procedural fairness and due process.  In *Citizens Association of Georgetown v.  Zoning Commission of District of Columbia*, the court examined whether ex parte communications between the Zoning Commission staff and other parties violated the requirements of the District of Columbia Administrative Procedure Act (DCAPA) and due process.  *Citizens Ass'n of Georgetown v. Zoning Com'n*, 477 F.2d 402, 405 (D.C. Cir. 1973).  The court focused on whether the proceeding was a rulemaking or a contested case and whether procedural fairness was maintained.  It found that procedural fairness was upheld because the final action was within the advertised proposals, appellants were offered the opportunity to comment, and they had significant opportunity to contribute to the decision-making process.

Similarly, in *Sloan v.  United States*, the court emphasized that *ex parte* communications should not influence the decision-making process and that any appearance of impropriety can damage public confidence in the judicial system.  *Sloan v.  U.S.*, 527 A.2d 1277 (D.C.  1987).  The court noted that contacts with the court by counsel or other persons are strongly discouraged unless adequate notice and opportunity to respond are given to all parties.

Furthermore, D.C.  Code § 2-509 requires that if a majority of the decision-makers did not personally hear the evidence, the agency must issue a proposed decision and allow parties to file exceptions and present arguments before issuing a final decision.  This ensures that all parties have a fair opportunity to be heard and to respond to any ex parte communications that

may have occurred (see *Potomac Elec. Power Co. v. Public Serv. Com'n,* 380 A.2d 126, 132 (D.C. 1977)*; Gallothom, Inc. v. District of Columbia Alcoholic Beverage Control Board,* 820 A.2d 530, 534 (D.C. 2003)).

In the present case, the District's Administrative Procedure Act underscores the fundamental principle that the decision-maker's mind should not be swayed by evidence not communicated to both parties and which they are not given an opportunity to contest.  It is customary practice for the ABC Board to host closed-door meetings after its open cease-and-desist hearings.  The content of these closed-door meetings is unknown to respondents, and new evidence might be presented without their knowledge or opportunity to respond.

Additionally, prior to issuing any cease-and-desist orders, the ABC Board conducts supplemental hearings that are closed to the public.  During these hearings, Supervisory Investigator Peru presents investigatory reports and evidence without the respondent's presence to provide context, supporting details, or contradictory evidence.  Because these investigatory and supplemental hearings occur ex-parte, the credibility or veracity of the witness is not tested or proven, and Supervisory Investigator Peru's testimony is accepted at face value without opposition.

These practices violate the DCAPA's ban on ex-parte communications as they compromise procedural fairness and due process.  The Defendants are propagating customs, policies, and practices that are inherently incompatible with D.C.  Code § 2-509.  The Plaintiff is therefore entitled to permanent injunctive relief against such customs, policies, and practices that allow ex parte communications in violation of D.C.  Code § 2-509, which have been used against the Plaintiff to reach erroneous conclusions of law and subject it to punitive actions.

Plaintiff demonstrates a likelihood to succeed on the merits of its D.C. Code § 2-509 claim.

## I. APPROPRIATIONS ACT-FEDERAL PREEMPTION

The legal standard to demonstrate that the District of Columbia wrongfully used funds to regulate and interfere with legal cannabis activity, despite a federal appropriations act prohibiting such use, involves showing that the District government engaged in actions that directly contravene the specific prohibitions set forth in the appropriations act. Specifically, it requires evidence that the District of Columbia allocated or expended funds in a manner that regulates or interferes with legal cannabis activities, contrary to the stipulations of the federal appropriations act known as the Harris Rider. This federal mandate supersedes the District of Columbia's local authority, and as long as the Harris Rider remains in effect, any attempt by the District of Columbia to regulate legal recreational cannabis transfers would be in direct violation of federal law.

Under D.C. Code § 48-904.01(a)(1)(A) and (B), cannabis transfers without remuneration are legal, meaning that the transfer of small amounts of cannabis between adults without any payment is permissible. However, the Further Consolidated Appropriations Act of 2024 prohibits the District of Columbia from using any funds to enact or carry out new regulations related to cannabis. This means that the District of Columbia lacks the authority to enforce rules or impose penalties on cannabis-related activities that are legal under existing District of Columbia law. Specifically, the Appropriations Act Rider restricts the District of Columbia from using funds to "legalize" or "reduce penalties" for Schedule I substances, which includes cannabis. Paradoxically, this also prevents the District of Columbia from creating or enforcing

regulations that further penalize an activity, such as transfers without remuneration, that is already not subject to penalties under current law.

ABCA, funded by the District's annual budget pursuant to D.C. Code § 25-210 and subject to congressional appropriations, has enforced penalties against the Plaintiff for allowing non-commercial cannabis transfers on its premises. These enforcement actions impose new restrictions that contradict both the allowance of adult-use transfers without remuneration and the prohibition of using funds to regulate or impose penalties on such activities. By doing so, the District of Columbia is effectively reimposing penalties for a legal activity that is beyond its authority, given the federal funding restrictions.

Furthermore, enforcing penalties or restricting these legal cannabis transfers simply because they occur within businesses would require specific legislation with that language. However, such enforcement actions would inherently involve the imposition of new penalties or restrictions, which the Appropriations Act prohibits the District of Columbia from implementing using either federal or local funds. This enforcement contradicts the spirit of the law and constitutes government overreach, as it necessitates the use of government funds and resources that the law specifically restricts for such purposes.

Additionally, there is a discrepancy between the statutes under Title 48, Chapter 9, and Title 7, Chapter 16B, of the D.C. Code. Title 48, Chapter 9, refers to "marijuana" and outlines the legal activities regarding cannabis, while Title 7, Chapter 16B, refers to "cannabis" and regulates substances beyond the scope of those regulated under Title 48. Enforcing the contradictory statutes of Title 7, Chapter 16B against legal activity found under D.C. Code § 48-904.01(a)(1)(A) and (B), and against substances not regulated by Title 48, effectively imposes

penalties for a legal activity, which is beyond the District's authority and violates the federal funding restrictions.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its Congressional Appropriations Act prohibition claim.

### J.  D.C.  CODE § 2-510(a)(3)(A), (C), (E) – Arbitrary and Capricious Decision

To demonstrate that ABCA decisions violate D.C.  Code § 2-510 by being arbitrary and capricious, several critical legal elements must be established.  An appellate court will overturn an agency's decision only if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  The agency is required to make findings on each material issue of fact, and these findings must be supported by substantial evidence in the record as a whole.  Furthermore, the agency's conclusions must logically flow from these findings and comply with the applicable law.  (*See* as *Johnson v. Dist. of Columbia Dep't of Health*, 162 A.3d 808, 810-811 (D.C. 2017); *Georgetown University v. DC Dept. Employment Serv*, 971 A.2d 909, 917 (D.C. 2009).

Under D.C.  Code § 2-510(a)(3)(A), (C), and (E), the appellate court examines the agency's order to determine whether it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; was issued without observance of procedure required by law; or is unsupported by substantial evidence in the record of the proceedings.  The court must affirm the agency's decision as long as it has made factual findings on each material contested issue, there is substantial evidence supporting each finding, and its legal conclusions logically follow from those findings.  (*See Elliot v. Dist. of Columbia Zoning Comm'n*, 246 A.3d 568, 579(D.C. 2021); *Douglas-Slade v. United States DOT*, 959 A.2d 698, 700 (D.C. 2008); and *Parreco v. Rental Housing Com'n*, 885 A.2d 327, 333 (D.C. 2005)).

In the present case, the Defendants are propagating customs, policies, and practices that violate D.C. Code §§ 2-510(a)(3)(A), (C), and (E). ABCA consistently issues warnings, cease-and-desist orders, and summary closure orders based on prejudicially erroneous facts and inaccurate conclusions of law. These practices are inherently incompatible with the statutory requirements, rendering them unlawful. As a result, the Plaintiff is entitled to permanent injunctive relief against such customs, policies, and practices. Plaintiff has suffered financial losses, cessation of operations, and reputational harm due to these unlawful actions.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its D.C. Code §§ 2-510(a)(3)(A), (C), and (E).

### K. MONELL

Under *Monell v. Department of Social Services*, municipalities can be held liable for constitutional violations resulting from official policies, practices, or customs that demonstrate deliberate indifference and directly cause harm. *Monell v. Department of Soc. Svcs.,* 436 U.S. 658, 694 (1978). Plaintiff contends that ABCA has implemented policies and enforcement practices that infringe upon its constitutional rights, causing significant harm to its operations. These policies include procedurally deficient enforcement mechanisms, arbitrary and capricious regulations, and coercive practices aimed at compelling businesses like the Plaintiff to enter the medical cannabis market.

To establish a Monell claim, a plaintiff must allege: "(1) that [they] possessed a constitutional right of which [they were] deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" (quoting *City of Canton v. Harris,* 489 U.S. 378, 385–391 (1989)).

The Plaintiff asserts deprivation of multiple constitutional rights.  First, ABCA's enforcement actions allegedly violated the Seventh Amendment right to a jury trial by imposing monetary penalties and property deprivations without the procedural safeguard of such a trial. Instead, the Plaintiff was subjected to closed-door hearings where decisions were made without impartiality or public transparency.  Second, the Plaintiff's Fifth Amendment right to due process was infringed through arbitrary cease-and-desist and summary closure issued without adequate pre-deprivation hearings.  For example, ABCA relied on the unchallenged testimony of its investigator to claim illegal activity on Plaintiff's premises on March 15, 2024, during a closed fact-finding hearing that excluded both Plaintiff and the public.  These violations were compounded by post-deprivation hearings that failed to correct erroneous findings, such as the acknowledgment in July 2024 that the Plaintiff's license applications had, in fact, been approved. Additionally, the enforcement actions are alleged to constitute a regulatory taking under the Fifth Amendment by depriving Plaintiff of its business premises and economic viability without just compensation, as demonstrated by the factually incorrect Summary Closure Order issued on October 30, 2024.

These constitutional violations purportedly stem directly from municipal policies and customs maintained by the ABCA.  The District of Columbia is alleged to have pursued a deliberate strategy to undermine recreational cannabis businesses like the Plaintiffs by forcing them into the medical cannabis market through onerous licensing requirements, including the submission of self-incriminating affidavits as part of the application process.  This policy, as outlined in D.C.  Code §§ 7-1671.01(9) and (22); 7-1671.12a; and 7-1671.08(g)(1), demonstrates a systemic disregard for constitutional protections and creates an environment of legal uncertainty that disproportionately harms lawful businesses.  Moreover, the ABCA's established

practice of issuing cease-and-desists and summary closures based on flawed and arbitrary

processes reflects an entrenched custom of procedural deficiency.  For instance, the Plaintiff was

issued a cease-and-desist on July 3, 2024, erroneously claiming that no license applications had

been submitted despite conditional licenses being approved just two days prior.  Even after the

order was vacated, ABCA issued a second cease-and-desist based on pure speculation;

accordingly, the harm caused by the cease-and-desist was unaddressed.

The District of Columbia's deliberate indifference to constitutional rights is evident in its

failure to rectify these systemic issues despite repeated concerns raised by affected businesses.

The ABCA's reliance on closed hearings, inaccurate enforcement claims, and arbitrary regulatory

distinctions between medical and recreational cannabis businesses has created a pattern of harm.

By maintaining these practices, the District of Columbia has demonstrated a disregard for the

rights of businesses operating lawfully under D.C.  Code § 48-904.01(a)(1)(B).  The Plaintiff's

harm, including financial losses, reputational damage, and cessation of operations, directly

results from these municipal policies and practices.  But for the District's alleged unconstitutional

enforcement actions, the Plaintiff contends it would have continued its lawful operations.

The Plaintiff has met the requirements for a *Monell* claim by demonstrating a deprivation

of constitutional rights, the existence of municipal policies or customs, deliberate indifference to

those rights, and a direct causal link between the policies and the harm suffered.  The District of

Columbia's enforcement actions, rooted in its official policies, are the moving force behind the

Plaintiff's injuries.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its *Monell*

claim.

### L.  DEFAMATION

Courts in the District of Columbia have established that to prevail on a defamation claim a plaintiff must prove four elements: (1) the defendant made a false and defamatory statement concerning the plaintiff; (2) the defendant published the statement without privilege to a third party; (3) the defendant's fault in publishing the statement amounted to at least negligence; and (4) either the statement is actionable as a matter of law irrespective of special harm, or its publication caused the plaintiff special harm. (*See Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005). A defamatory statement is one that "tends to injure [the] plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000). However, a remark is not defamatory unless it is "more than unpleasant or offensive; the language must make the plaintiff appear odious, infamous or ridiculous." Id. The publication of allegedly defamatory statements must be considered "as a whole, in the sense in which it would be understood by the readers to whom it was addressed." *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984). Whether a statement is reasonably capable of defamatory meaning is a question of law. *Weyrich v. New Republic*, 235 F.3d 617, 627 (D.C. Cir. 2001).

In the present case, the Defendants, through the ABCA, issued a publicly accessible cease-and-desist and summary closure orders containing defamatory statements that were made at least negligently and have caused the Plaintiff special harm. Specifically, the cease-and-desist and summary closure orders include the following false assertions:

"The Board further notes that the sale and distribution of illegal cannabis immediately threatens the health and safety of the public because unregulated products may contain inappropriate and harmful substances (e.g., pesticides, other narcotics). In addition, unlicensed businesses are at risk of selling cannabis to persons who should not have access to cannabis, such

as minors.  Finally, such activity constitutes a nuisance under D.C.  Official Code § 7-1671.13e.

See also *Com.  ex rel.  Preate v.  Danny's New Adam & Eve Bookstore*, 625 A.2d 119, 122

(1993) ('It is well-settled that even a lawful business may be enjoined from operation if it is

shown that, under the particular circumstance, its operation constitutes a public nuisance'); *Camp*

*v.  Warrington*, 227 Ga.  674, 674 (1971).  ('[W]here it is made to appear with reasonable

certainty that irreparable harm and damage will occur from the operation of an otherwise lawful

business amounting to a continuing nuisance, equity will restrain the construction, maintenance

or operation of such lawful business.')."

Additionally, ABCA continued to associate Plaintiff with activities at 335 H Street, N.E.,

after it vacated the premises and offer this information unchecked at closed fact-finding hearing

with the ABC Board.  A summary closure was issued against Plaintiff and publicly posted in

reckless disregard of the truth.

The cease-and-desist and summary closure orders also falsely stated that the Plaintiff sold

and distributed illegal cannabis, which is untrue as the Plaintiff operated a retail art business

prior to obtaining its conditional medical cannabis license.  The order further insinuates that

Plaintiff's products may contain harmful substances like pesticides or other narcotics and that

Plaintiff may have sold cannabis to minors, both baseless and damaging accusations.

Such statements are defamatory because they tend to injure the Plaintiff in its trade and

community standing by portraying it as engaging in illegal and unethical activities.  The

language used makes the Plaintiff appear odious and infamous, exceeding mere unpleasantness

or offensiveness.  The defamatory content was published without privilege to third parties, as the

cease-and-desist order was made publicly accessible, and the Defendants failed to verify the

accuracy of the statements, demonstrating at least negligence in their publication.

Moreover, the Defendants' assertions are contradictory to their own practices. While the ABCA claims that untested cannabis poses irreparable harm, it has historically allowed medical cannabis cultivators and retail dispensaries to circumvent testing requirements for their cannabis products. Over the past decade, the ABCA has assisted these entities in misleading the public into believing that medical cannabis in the District of Columbia was lab-tested when it was not. This inconsistency highlights the arbitrary and capricious nature of the Defendants' actions toward the Plaintiff. A cannabis testing lab was not available to the public or medical cannabis participants unit September of 2024.

Additionally, during inspections, the ABCA relies on faulty and inaccurate field tests that often yield false positives. Despite these tests being presumptive and not legally conclusive, the ABCA uses them in press releases, investigative reports, and as conclusive evidence in cease-and-desist and summary closure orders. This practice further undermines the credibility of the Defendants' claims and amplifies the defamatory impact on the Plaintiff.

The publication of these false statements without consideration for their veracity has tarnished the Plaintiff's reputation, causing special damages such as loss of business opportunities, financial losses, and harm to its professional reputation. Given that the statements are reasonably capable of defamatory meaning, the Plaintiff's defamation claim is legally substantiated.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its defamation claim.

### M. FOURTH AMENDMENT

To establish that an agency inspection violates the Fourth Amendment due to warrantless access to an entire premises in the District of Columbia, several key legal principles must be

demonstrated.  Generally, any search conducted without a warrant is per se unreasonable under

the Fourth Amendment unless it falls within specific and well-established exceptions (*See Smith*

*v. United States*, 283 A.3d 88, 94 (D.C. 2022); *Ellison v. United States*, 238 A.3d 944, 949 (D.C.

2020)).

One such exception is consent.  A warrantless search is permissible if it is based on a

reasonable belief that the person consenting to the search has the authority to do so.  This

determination is inherently factual and assessed against an objective standard.  (*See Ashby v.*

*United States*, 199 A.3d 634, 649 (D.C. 2019); *Fogg v. United States*, 247 A.3d 306, 313-314

(D.C. 2021)).  Another exception is exigent circumstances, which permit warrantless searches

when law enforcement has compelling needs that make obtaining a warrant impractical.  These

circumstances include scenarios such as hot pursuit, imminent destruction of evidence, or the

protection of police or public safety (*See Hawkins v.  United States*, 113 A.3d 216 (D.C.  2015)).

Additionally, the community caretaking function can justify warrantless searches in contexts

where police perform non-criminal functions, such as vehicle searches.  (*See McGlenn v. United*

*States*, 211 A.3d 1133, 1135-1138 (D.C. 2019)).

In the context of administrative searches, even if an exception to the warrant requirement

applies, the government must demonstrate that the search was reasonable in its scope and manner

of execution.  The burden is on the government to justify the search based on facts that could

place it within recognized, limited exceptions to the warrant requirement (see *Akinmboni v.*

*United States*, 126 A.3d 694, 697 (D.C.  2015); *Bennett v. United States*, 26 A.3d 745 (D.C.

2011)).

In this case, D.C.  Code § 7-1671.05(b)(14A) authorizes the Alcoholic Beverage and

Cannabis Administration (ABCA) to conduct both announced and unannounced inspections of

"unlicensed establishments." However, the definition of "unlicensed establishment" is vague and lacks a clear standard for the phrase "exchange as part of a commercial transaction." The term "commercial transaction" is being applied ad hoc to include transfers of cannabis without remuneration occurring in commercial spaces, despite such transfers being legal under D.C. Code § 48-904.01(a)(1)(B). Consequently, permitting inspections of "unlicensed establishments," a term devoid of constitutional clarity, effectively authorizes unconstitutional, warrantless searches of the Plaintiff and similarly situated businesses in violation of their Fourth Amendment rights.

The unconstitutionality of ABCA's actions is further compounded by D.C. Code § 7-1671.08(g)(1), as amended by the Medical Cannabis Clarification and Program Enforcement Emergency Amendment Act of 2024, which states that "ABCA shall have the authority to inspect the entire premises, inventory, and business records of an unlicensed establishment to determine whether the business is conducting activity in violation of this title." This broad authorization effectively permits warrantless searches without adhering to constitutional safeguards.

Under 42 U.S.C. § 1983, any person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects any citizen to the deprivation of constitutional rights is liable to the injured party. The Defendants, acting under color of law, have subjected the Plaintiff to such deprivation of Fourth Amendment rights.

None of the established exceptions to the warrant requirement justify ABCA's inspection of unlicensed establishments as Plaintiff is labeled by ABCA. First, the statute that allows for unannounced and announced inspections removes Plaintiff's ability to refrain from consenting to

the inspection.  Second, exigent circumstances were absent; the inspection would not be in response to an imminent threat nor undertaken to prevent the destruction of evidence or ensure public safety.  Third, the inspections are investigatory in nature and do not qualify under the community caretaking function, which applies only in non-criminal contexts.

As a settled Fourth Amendment principle, "the property of every man [is] so sacred, that no man can set his foot upon his neighbor's close without his [license]" (*Entick v.  Carrington*, 95 Eng.  Rep.  807 (K.B.  1765)).  While a police officer may approach a home and knock without a warrant because that is no more than any private citizen might do, ABCA's authority to inspect an "unlicensed establishment's" entire premises and business records far exceeds what a private citizen might do.  Private citizens cannot enter a retailer's back office without permission, and the inspection statute does not arm ABCA with search warrants when conducting such inspections.

Additionally, the ambiguity around the term unlicensed establishment significantly increases the likelihood that businesses will be wrongfully classified as "unlicensed establishments," thereby subjecting them to ABCA inspections of their premises and business records without a search warrant, in violation of their Fourth Amendment rights.  The District of Columbia's wrongful application of the term to businesses like the Plaintiff's, which were operating lawfully under D.C.  Code 48-904.01, illustrates the dangers of this overreach.

Therefore, the statute's authorization of ABCA to conduct searches without a warrant or appropriate exception is facially invalid.  The aforementioned statutes, regulations, and practices, as executed and enforced by the Defendants under color of law, violate the Plaintiff's constitutional protections under the Fourth Amendment.

In the context of administrative searches, the government bears the burden of demonstrating that a warrantless search is reasonable and justified under the circumstances.  (*See*

*Ellison v. United States,* 238 A.3d 944 (D.C. 2020)). Here, ABCA's actions fail this test. The announced and unannounced inspections are neither supported by any exception to the warrant requirement nor reasonable in scope or execution. Instead, it is part of a broader pattern of arbitrary enforcement against businesses improperly labeled as "unlicensed establishments" under the 2024 Act.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its Fourth Amendment claim.

## N. MALICIOUS PROSECUTION

To establish a claim of malicious prosecution against the ABCA, DCLP, MPD, and other Defendants, a plaintiff must demonstrate four essential elements: (1) the underlying legal proceeding terminated in the plaintiff's favor; (2) the defendant acted with malice; (3) there was a lack of probable cause for the proceeding; and (4) the plaintiff suffered a special injury as a result of the original action. (*See Joeckel v. Disabled American Veterans,* 793 A.2d 1279, 1282-1284 (D.C. 2002); *Brown v. Carr,* 503 A.2d 1241, 1244 (D.C. 1986); and *Havilah Real Property Services, LLC v. VLK, LLC,* 108 A.3d 334, 354-357 (D.C. 2015). The requirement of "special injury" has been narrowly defined in District of Columbia law. It includes arrests, seizures of property, or injuries that would not typically result from similar legal actions. Injuries such as reputational harm, emotional distress, loss of income, and substantial expenses in defending oneself generally do not meet this criterion, as established in *Joeckel* and *Havilah*.

Applying these elements to the present case involving Plaintiff:

First, the underlying legal proceeding terminated in the Plaintiff's favor. On or about July 3, 2024, the Defendants initiated a legal action against the Plaintiff before the Alcoholic Beverage Control Board (Case No. 24-ULC-00001, Board Order No. 2024-472), alleging

violations of D.C. Code §§ 7-1671.12a(a); 7-1671.08(f); 7-1671.01(22); and 7-1671.13e. This proceeding was terminated in the Plaintiff's favor on or about July 17, 2024, when the Board vacated Board Order No. 2024-472. On October 30, 2024, executed a summary closure order that erroneously list Plaintiff as the respondent, which was inaccurate because Plaintiff vacated the premises and terminated its lease prior to the events that lead to summary closure action took place.

Second, there is evidence suggesting that the Defendants acted with malice in initiating and prosecuting the proceeding. The Defendants allegedly failed to include exculpatory evidence in the case report and testimony to the Board. Specifically, Supervisory Investigator (SI) Peru purportedly omitted a letter sent to him by the Plaintiff, which indicated the Plaintiff's intent to apply for conditional medical cannabis retailer and internet retailer licenses. Furthermore, SI Peru is accused of providing the Board with information that was knowingly false or made with reckless disregard for the truth, asserting that the Plaintiff did not have a pending application at the time of his testimony. SI Peru has been observed to state that he was "going to get" the Plaintiff.

Third, the Defendants lacked probable cause to initiate and prosecute the proceeding. There was reportedly no personal observation of illegal cannabis sales by the Plaintiff, and inaccurate facts were presented to the Board regarding the status of the Plaintiff's medical cannabis applications. Notably, the Plaintiff had submitted the required applications, which were approved on July 1, 2024, prior to the initiation of the enforcement action. Additionally, Plaintiff presented evidence that the cannabis and the transfer of cannabis with remuneration that occurred on Plaintiff's premises was handled by another business entity other than Plaintiff. Regarding, the summary closure action Plaintiff vacated the premises and terminated its lease

prior to the events that lead to the summary closure action and a new tenant occupied the premises.

Fourth, the Plaintiff suffered special injury as a direct and proximate result of the Defendants' malicious prosecution. This includes seizure of property, financial losses, cessation of operations, and reputational harm. The cease-and-desist orders and summary closure orders and subsequent enforcement actions effectively deprived the Plaintiff of use of its business premises, forced them to terminate its lease and forfeit property to seizure, which is a recognized form of special injury under District of Columbia law.

Plaintiff demonstrates a substantial likelihood to succeed on the merits of its malicious prosecution claim.

## II.   Plaintiff Demonstrates That It Is Suffering Irreparable Harm During The Pendency Of The Action And Will Continue To Suffer Irreparable Harm If This Injunction Is Not Granted.

Plaintiff faces immediate and irreparable harm during the pendency of this action, due to the Defendants' unconstitutional actions on multiple levels. However, before Plaintiff describes the irreparable harm that it would face, it will first rebut Defendants' counterargument that since the cannabis on Plaintiff's premises is transferred without remuneration, then the cessation of cannabis transfers should have a *de minimis* effect on the viability of the business.

This counterargument is flawed in that it overlooks the effect that the designation of "unlicensed establishment" and Defendants' enforcement effect the validity of Plaintiff's certificate of occupancy, business license, and other business formation issues that carry the real threat of putting Plaintiff out of business or subjected to significant expense in seeking a license and permit for its operation and restructuring the business. The court in *District of Columbia v. E. Trans-Waste of Md., Inc.,* found similar facts to be an irreparable harm.

Secondly, Defendants' counterargument fails to consider that even though cannabis was not sold and was not part of a tie-in sale, the transfer without remuneration aspect is a notable driver of foot traffic for Plaintiff.  Coincidingly, Plaintiff has cultivated a reputation, brand, and significant goodwill around the transfer of cannabis without remuneration and the cessation of those transfers would cause a drastic loss of market differentiation, foot traffic, and brand loyalty that would end the business's existence and operations.  Here, Plaintiff is clinging on to its existence, which is why it seeks this preliminary injunction because it is currently generating no revenue and is not operating due to Defendants enforcement actions.

 Now moving toward the irreparable harm that Plaintiff faces.  First, the violation of Plaintiff's constitutional rights, including unjust property deprivation, interference with private contracts, warrantless searches, denial of jury trials, and discrimination against out-of-state entities, constitutes, *per se* irreparable harm that cannot be remedied by monetary damages alone. The Defendants' enactment and enforcement of provisions the District of Columbia's medical cannabis legislation threaten Plaintiff's continued business existence, subjecting it to significant expense and the burden in attempting to restructure its operations.  Enforcement actions have resulted in Plaintiff's inability to operate effectively destroying its economic viability and goodwill.  ABCA's public enforcement actions and erroneous determinations cast doubt on the legality of the Plaintiff's operations, causing reputational harm that deters future business opportunities and undermines customer trust.

Furthermore, conflicting statutory frameworks create legal uncertainty, prohibiting Plaintiff's ability to conduct lawful business operations.  While the Plaintiff complies with D.C. Code § 48-904.01, which legalized the possession and non-remunerative transfer of small amounts of cannabis between adults over 21, Defendants' arbitrary enforcement practices

undermine this compliance and put Plaintiff's entire business model at risk. The severity of these harms, particularly the constitutional violations and Defendant's enforcement which threatens Plaintiff's existence and operations, including licensing and business structure, demonstrates the urgent need for injunctive relief.

Plaintiff has faced cease-and-desist and summary closure orders that were based on erroneous facts and without proper due process. This harm has already occurred and cannot be cured by monetary damages; however, injunctive relief would help remedy the harm caused by the cease-and-desist and summary closure by preventing any further similar action by halting any further enforcement action against Plaintiff.

Plaintiff's harm is not speculative but immediate and ongoing, including constitutional violations that have not been remedied and loss of its business operations and goodwill. Defendants' legislation and enforcement actions have caused Plaintiff to suffer irreparable harm that cannot be compensated by monetary damages alone. The reputational damage from public enforcement actions further exacerbates this harm, undermining customer trust and deterring future business opportunities.

## III. Plaintiff Demonstrates That The Balance Of The Equities Favors Plaintiff.

The balance of equities decisively favors granting Plaintiff's preliminary injunction. The Plaintiff is facing immediate and severe harm that threatens the very existence of its business. The enforcement of the challenged Acts, statutes, regulations, and practices not only place Plaintiff at risk financial ruin but also results in irreparable harm through the deprivation of fundamental constitutional rights, including violations of the Fourth, Fifth, and Seventh Amendments, the Contracts Clause, and District of Columbia law. As established in *District of Columbia v. Group Insurance Administration*, economic loss constitutes irreparable harm when

it threatens the existence of the movant's business.  *District of Columbia v.  Group Insurance Administration,* 633 A.2d 2, 23 (D.C.  1993).  Similarly, in *District of Columbia v.  E.  Trans-Waste of Md., Inc.*, the court recognized that enforcement actions carrying the threat of putting a business out of operation or subjecting it to significant expense weigh heavily in favor of injunctive relief.  (*District of Columbia v.  E.  Trans-Waste of Md., Inc.*, 758 A.2d 1, 15 (D.C. 2000).

Without the injunction, the Plaintiff's business will remain shuttered, and its ability to seek redress for these harms will be significantly impaired.  The harm is not speculative but concrete and ongoing, including loss of goodwill, customer relationships, and the potential collapse of the business.  These damages cannot be adequately compensated by monetary relief alone, as they involve intangible assets essential to the Plaintiff's operations.

Conversely, the Defendants would suffer minimal, if any, harm if the injunction is granted.  Enjoining the enforcement of unconstitutional statutes and practices would have little impact on their day-to-day operations concerning cannabis regulation.  The Defendants retain the authority to regulate cannabis within constitutional boundaries, and the injunction would merely prevent the enforcement of provisions that infringe upon constitutional rights.  This aligns with the principle that the government cannot claim harm from being enjoined from unconstitutional actions.

Moreover, granting the injunction serves the public interest by upholding constitutional mandates and ensuring that regulatory actions comply with legal standards.  The Defendants' misleading public narrative regarding the safety and testing of medical cannabis exacerbates the harm to the Plaintiff and undermines public trust.  Historically, ABCA failed to ensure laboratory testing of medical cannabis, allowing untested products to enter the market under the guise of

being medically approved.  Continuing enforcement under these circumstances risks further eroding regulatory credibility.

By granting the injunction, the Court would not only prevent irreparable harm to the Plaintiff but also promote fairness and integrity in the regulatory process.  This action benefits both the Plaintiff and the public by ensuring that cannabis regulation is carried out within the bounds of constitutional and statutory law without arbitrary or discriminatory enforcement.  The balance of equities, therefore, weighs heavily in favor of the Plaintiff, as the severe and immediate harm faced by the Plaintiff significantly outweighs any minimal inconvenience to the Defendants.

## IV.  Plaintiff Demonstrates That The Public Interest Would Not Be Disserved By The Issuance Of This Injunction.

The issuance of a preliminary injunction fundamentally serves the public interest by ensuring constitutional and congressional compliance, fostering economic stability, and protecting public trust.  The Plaintiff's request compels government actions to adhere strictly to constitutional safeguards, particularly the rights to a jury trial and due process, and the prohibitions against arbitrary regulatory takings and vague statutes that lack an articulable standard.  These constitutional rights are the bedrock of a just legal system and embody broader societal values that transcend the Plaintiff's individual circumstances.  Additionally, Plaintiff's request compels government action to adhere to the restraints of congressional appropriation acts.  Here, the Harris Rider explicitly limits the expenditures of the District of Columbia.

Moreover, granting the injunction would enable the Plaintiff to resume lawful business operations, thereby contributing to economic stability, preserving jobs within the community, and tax revenue to the District of Columbia.  Plaintiff's compliance with D.C. Code § 48-904.01 demonstrates adherence to voter-approved regulations, underscoring that the requested relief

supports lawful and transparent business practices.  This alignment not only reinforces the legitimacy of the Plaintiff's operations but also promotes confidence in business in the District of Columbia work within the frameworks established by democratic processes.

Additionally, halting enforcement under the current regulatory regime prevents the Defendants from perpetuating misleading claims about the safety and testing of medical cannabis and recreational cannabis.  Such misleading narratives undermine public trust.  By granting the injunction, the Court would ensure that regulatory actions are based on accurate information and uphold the integrity of public health standards.

In summary, the preliminary injunction is imperative for maintaining constitutional integrity, supporting economic resilience, and safeguarding public health.  It aligns with the collective interests of the community by promoting fair and transparent governance, enabling lawful business activities, and preventing the dissemination of harmful misinformation. Therefore, the issuance of the injunction is not only justified but essential to uphold the fundamental principles that benefit both the Plaintiff and the broader public.

## CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that this Court issue a preliminary injunction to halt the Defendants' enforcement actions.  The Plaintiff has demonstrated a substantial likelihood of success on the merits, irreparable harm in the absence of relief, a favorable balance of equities, and alignment with the public interest.  By granting the injunction, the Court will preserve the Plaintiff's constitutional rights, prevent further harm, and ensure that the regulatory framework governing cannabis activity in the District of Columbia adheres to lawful and fair standards.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests an oral hearing and that this Court grant its Motion for Preliminary Injunction.

By:/s/Jacobie Whitley
Jacobie Whitley, Esq.  (DC Bar #1500314)
Law Office of Jacobie K Whitley, PLLC
1455 Pennsylvania Avenue NW
Suite 400
Washington, DC 20004
*Counsel for Plaintiff*